PUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Felton, Judges McCullough and Decker
Argued at Chesapeake, Virginia

SHONTRINA CHARON FOUNTAIN

                                                    OPINION BY
v.        Record No. 2212-13-1        JUDGE STEPHEN R. McCULLOUGH
                                                    NOVEMBER 4, 2014

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Glenn R. Croshaw, Judge

Bassel Khalaf, Assistant Public Defender (Office of the Public
Defender, on briefs), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Shontrina Charon Fountain challenges her conviction of misuse of the 9-1-1 system, in

violation of Code § 18.2-429(B).  She argues that the evidence fails to establish that she possessed

the requisite intent "to annoy, harass, hinder or delay emergency personnel in the performance of

their duties" at the time she "caus[ed] the telephone to ring."  We agree and reverse her conviction.

BACKGROUND

On March 25, 2013, at approximately 8:50 p.m., appellant was driving with her two

daughters, aged eight and eleven, in the back seat.  Officer J.D. Gates of the Virginia Beach Police

Department observed appellant's vehicle briefly drift in and out of the adjacent lane.  He initiated a

traffic stop, and appellant pulled over to the side of the road.  Due to the proximity of the vehicles to

an intersection, Officer Gates, for safety purposes, asked appellant to move her car to the nearby

parking lot of a check cashing business.  He gestured with his hand to that effect.

Although the entrance of the parking lot was well-lit, the area of the lot located "more than two car lengths" beyond the entrance was fairly dark. Officer Gates did not specify that appellant should park in the well-lit portion of the lot. Appellant pulled into the parking lot, slowed down, made a U-turn away from the check cashing business, and abruptly reversed her vehicle. In the process, she struck but did not damage the building. She reoriented her vehicle so that the front of her car was facing the police vehicle and the exit of the parking lot. She then rolled her car toward Gates's police vehicle, stopped briefly, and rolled forward once more. She came to a complete stop approximately three feet from the police cruiser. Appellant later explained that she turned her vehicle around to be closer to the light.

Because appellant repeatedly moved her car toward the police vehicle, a second officer reached into appellant's car and placed it in park while Officer Gates removed her keys from the ignition. Officer Gates testified that, due to appellant's failure to follow his commands (which the record does not specify), he told appellant that he would drag her from her car and pepper-spray her if she did not obey. Appellant then insisted on calling her attorney. Officer Gates told her that she had no right to do so.

At this point, appellant locked her vehicle and dialed 9-1-1 from her cell phone. She testified that she felt unsafe because Officer Gates directed her to pull into a poorly lit portion of the parking lot and threatened to drag her from her vehicle and pepper-spray her. She stated that she wanted "everything recorded and documented because this is not normal for police to ask you to pull in the back of a dark parking lot, threaten to drag you out, and threaten to pepper-spray you. There's nothing normal and okay about that." Appellant repeatedly voiced concerns to the dispatcher that she was not allowed to call her attorney. She stated multiple times that she feared for her safety because of Officer Gates's threats to use physical force and pepper-spray her if she did not comply with his requests. She testified that her children were "freaked out," that she was

- 2 -

merely heading home from church, and that she did not know why Officer Gates had pulled her over. She repeatedly stated that the officer directed her to pull into the back of a dark parking lot and that she did not feel safe.

About twelve minutes into the call, Officer Gates's supervisor, Sergeant N.C. Creekmore, arrived at the parking lot. Creekmore asked appellant to put down her cell phone and speak to him. Appellant refused. She said that she did not want the dispatcher to go "because [she] want[ed] to record it." The dispatcher at one point said, "I'll let you go now," to which appellant responded, "[N]o ma'am, I don't want you to get off. I don't want you to get off." Appellant resisted Sergeant Creekmore's entreaties to hang up the phone. Appellant told the dispatcher, "Ma'am, I don't want you to get off [the phone] because I'm scared. I'm scared of him. I'm scared of him." She explained that she dialed 9-1-1 because "they always have to pick up," she "want[ed] everything recorded and documented," and she "want[ed] it all recorded."

About twenty minutes into the call, the dispatcher informed appellant that she needed to conclude the call because Sergeant Creekmore was on the scene. After the dispatcher had twice told appellant she needed to conclude the call, appellant stated that she still did not feel safe. She asked to speak with the dispatcher's supervisor. The dispatcher agreed to transfer the call, but the call was disconnected. The parties stipulated that appellant called back for the sole purpose of reestablishing a connection with the dispatcher's supervisor. She then spoke with the 9-1-1 supervisor, Matthew Berg.

Appellant told Berg that she did not feel safe, the officers would not allow her to call an attorney, and she did not want to get off the phone. Berg told appellant she needed to comply with the police officers at the scene. He said she would be placed on hold while he spoke with Sergeant Creekmore. Appellant replied, "Okay, I just don't want to be disconnected until I'm able to drive off and I have my keys back in my hand and I can call my attorney."

While she was on hold, the call was again inadvertently disconnected. Berg called appellant back to reestablish a connection. He explained that the officers were trying to issue her traffic tickets and that she would be free to leave after they had been issued. Appellant asked Berg to stay on the phone while the tickets were being issued. She obtained reference information from Berg about the case number of the 9-1-1 call and the names of the officers involved. Appellant then thanked Berg for his assistance and ended the call. Appellant's entire interaction with 9-1-1 personnel lasted approximately thirty-seven minutes.

In a motion to strike, appellant argued, among other things, that the evidence did not prove that she had the intent to annoy, harass, hinder, or delay emergency personnel when she placed the 9-1-1 call, as required by Code § 18.2-429(B), and that she placed the call because she felt frightened. She renewed that argument at the close of the evidence.

Following a bench trial, the court convicted appellant of violating Code § 18.2-429(B). Appellant was fined $500 and given a thirty-day sentence, which was suspended on condition of good behavior for two years. The court found that, although appellant initially placed the call because she felt terrified, the fact that she did not hang up the phone after Sergeant Creekmore arrived on the scene, combined with the fact that she remained on the phone for the thirty-seven minutes duration of the call, showed that "she certainly developed an additional intent to, perhaps, intimidate the officers, by remaining on the phone with the 9-1-1 dispatchers." This appeal followed.

## ANALYSIS

### I. APPELLANT'S ARGUMENT IS NOT PROCEDURALLY DEFAULTED.

At the outset, the Commonwealth asserts that appellant's central argument is procedurally defaulted. We disagree. The written statement of facts, which the trial court signed, shows that appellant repeatedly argued at trial that she did not possess the requisite intent "at the time the

emergency call was placed." This is the argument appellant makes on appeal. The purpose of Rule 5A:18 is "to alert the trial judge to possible error so that the judge may consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals and mistrials." Martin v. Commonwealth, 13 Va. App. 524, 530, 414 S.E.2d 401, 404 (1992) (en banc). "In addition, a specific, contemporaneous objection gives the opposing party the opportunity to meet the objection at that stage of the proceeding." Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991). The arguments made by appellant at trial, as reflected in the statement of facts, satisfy Rule 5A:18.

## II. UNDER THE PLAIN LANGUAGE OF THE STATUTE, THE ACCUSED MUST POSSESS THE INTENT TO ANNOY, HARASS, HINDER, OR DELAY EMERGENCY PERSONNEL AT THE TIME HE CAUSES A TELEPHONE TO RING.

Appellant argues that Code § 18.2-429(B) requires an appellant to possess the "intent to annoy, harass, hinder or delay emergency personnel" at the time the 9-1-1 call is placed, i.e., when the caller "causes a telephone to ring." The fact that a caller may develop such an intent *after* the call is placed, she asserts, does not constitute a violation of the statute. The Commonwealth presses a different reading of the statute, contending that such a statutory reading is inconsistent with the purpose of the statute and would lead to anomalous results.

The question before us is one of statutory construction. We review such questions *de novo* on appeal. Kozmina v. Commonwealth, 281 Va. 347, 349, 706 S.E.2d 860, 862 (2011). Courts apply the plain meaning of a statute "'unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" Baker v. Commonwealth, 284 Va. 572, 576, 733 S.E.2d 642, 644 (2012) (quoting Boynton v. Kilgore, 271 Va. 220, 227, 623 S.E.2d 922, 926 (2006)).

Code § 18.2-429(B) provides that

> [a]ny person who, with or without intent to converse, but with intent to annoy, harass, hinder or delay emergency personnel in the performance of their duties as such, causes a telephone to ring, which is owned or leased for the purpose of receiving emergency

- 5 -

> calls by a public or private entity providing fire, police or emergency medical service, and any person who knowingly permits the use of a telephone under his control for such purpose, is guilty of a Class 1 misdemeanor.

The statutory language is not ambiguous, and the Commonwealth does not argue to the contrary. Read according to its plain meaning, Code § 18.2-429(B) requires that the intent be present when a person "causes a telephone to ring." An intent to "annoy, harass, hinder or delay" that arises during the call, i.e., *after* the 9-1-1 telephone has been caused to ring, does not fall within the scope of the statutory prohibition. The trial court here found that appellant did not possess the requisite intent when she made the call but that she developed an intent to intimidate the officers as she remained on the telephone. This finding, which served as the basis for conviction, cannot be squared with the statute's plain language.[1] In the absence of the required intent, appellant cannot be convicted of violating the statute.

In support of affirmance, the Commonwealth points out that appellant called 9-1-1 not just once but twice. The Commonwealth contends that, under the deferential standard of review for the sufficiency of the evidence, we should conclude that appellant possessed the requisite intent when she made this second phone call. The Commonwealth notes that the call was disconnected after approximately twenty minutes and, by that time, Sergeant Creekmore had arrived at the scene. Sergeant Creekmore's presence, according to the Commonwealth, should have allayed any of appellant's fears. The difficulty with this contention is that the Commonwealth stipulated at trial that appellant called back, after the first call disconnected, "for the sole purpose of reestablishing a connection with the dispatcher's supervisor." After the call was disconnected again, Berg called

---

[1] The final clause of Code § 18.2-429(B), which applies the statutory prohibition to "any person who knowingly permits the use of a telephone under his control for such purpose," clearly does not apply to appellant here. First, the same offending intent applies, namely, an intent to cause the telephone to ring. Second, appellant is the one who placed the call; she did not permit another person to use her phone to place a call knowing it would be made with the intent to annoy, harass, hinder, or delay.

- 6 -

and reestablished the connection. Parties are bound by their factual stipulations. See Barrick v. Bd. of Supervisors of Mathews Cnty., 239 Va. 628, 631, 391 S.E.2d 318, 320 (1990).

The Commonwealth also argues that a plain language reading of the statute "makes little sense" because it would sanction a brief call for which the offending purpose is immediately apparent but would not punish a caller, like appellant, who was on the phone with emergency personnel for over thirty minutes. We see nothing absurd about a plain language interpretation of Code § 18.2-429(B). It is perfectly logical for the General Assembly to choose statutory language that does not discourage persons with real or perceived emergencies from calling 9-1-1. Should the purpose of the call change from a concern about genuine or a perceived emergency to a call maintained for the purpose of annoying, harassing, hindering, or delaying emergency personnel, 9-1-1 personnel can resort to the simple expedient of hanging up the phone. More fundamentally, we are not at liberty to rewrite the statute.

> When the language of a statute is plain and unambiguous, we are bound by the plain meaning of that statutory language. Thus, when the General Assembly has used words that have a plain meaning, courts cannot give those words a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed.

Lee Cnty. v. Town of St. Charles, 264 Va. 344, 348, 568 S.E.2d 680, 682 (2002) (citations omitted).

## CONCLUSION

We reverse the judgment of the trial court.

Reversed and final judgment.